UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LYDIA M. BACON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-CV-1621 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 4, 2011, plaintiff Lydia Bacon protectively filed applications for a period of disability, disability insurance benefits, and disabled widow benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of October 21, 2007. (Tr. 166, 172-75). After plaintiff's applications were denied on initial consideration (Tr. 86-87, 88), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 100-01).

Plaintiff and counsel appeared for a hearing on December 18, 2012. (Tr. 48-78). The ALJ issued decisions denying plaintiff's applications on April 12, 2013. (Tr. 10-28, 29-47). The Appeals Council denied plaintiff's request for review on July 16, 2014. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In a Disability Report dated May 31, 2011 (Tr. 193-203), plaintiff listed her disabling conditions as arthritis — no cartilage in knee; multiple sclerosis; Sjogren's syndrome; depression; poor reading ability and math skills; and learning disability. She reported that she stopped working on October 21, 2007, due to her conditions. She had previously worked folding uniforms, packing orders in a warehouse, and checking product for a radio manufacturer. She was prescribed amitriptyline,[1] clonazepam,[2] Betaseron,[3] hydrocodone, medications for the treatment of acid reflux, high cholesterol, circulatory problems, dry skin and allergies, and vitamin and mineral supplements. (Tr. 197). In an updated report on August 1, 2011 (Tr. 231-37), plaintiff noted that she had developed weakness on her left side, which made it difficult for her to balance and she used a cane about once a week. In December 2011, her additional medications included Ambien and levothyroxine, a thyroid hormone. (Tr. 248).

In a Function Report dated July 5, 2011, (Tr. 220-30), plaintiff stated that she lived in a house with adult relatives. In response to a question about her daily activities, plaintiff stated that she went outside when able and did laundry if she was not in pain. Pain interfered with her ability to sleep and to complete household chores. In addition, she could not tolerate heat. Generally, the meals she prepared were frozen foods. When able, she mowed the grass on a riding mower and cleaned. She was able to go out alone, drive, and shop, which she did about once a

---

[1] Amitriptyline is a tricyclic antidepressant, sometimes used to treat eating disorders and post-herpetic neuralgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (last visited on August 28, 2015).

[2] Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders. See Phys. Desk Ref. 2782 (60th ed. 2006).

[3] Betaseron, or Interferon Beta-1b Injection, is used to reduce episodes of symptoms in patients with relapsing-remitting multiple sclerosis. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601151.html (last visited on August 28, 2015).

week. Her hobbies included watching television and working on puzzle books. She occasionally visited her son and she talked with her family on the computer. She often dropped things due to arthritis in her hands. Plaintiff had difficulties with lifting, squatting, bending, walking, kneeling, climbing stairs, memory, following instructions, and using her hands. She could not lift more than 10 pounds or walk more than 20 steps before needing to rest for 5 minutes. She occasionally used a cane. She could pay attention for 30 minutes and could not finish things she started. She could pay bills, count change and manage a savings account, but had problems writing checks. She had trouble understanding written instructions but had fewer difficulties with spoken instructions. She got along well with authority figures. She could handle changes in routine but not stress. A third-party Function Report completed by plaintiff's brother is consistent with her own report. (Tr. 205-12).

## B. Testimony at Hearing

Plaintiff testified that she left school in the seventh grade. She was able to read at the fourth-grade level of ability at that time. (Tr. 59). She stated that reading "aggravates" her and she does as little writing as possible. She is able to read and write a shopping list, although her spelling is not correct. Contrary to what she stated in her Function Report, she testified that she could not make change and only understands how to do addition. Plaintiff worked for eight years repacking radios. See Tr. 61 (describing the work as taking the radios out boxes, making sure there was nothing wrong with them, repacking them and sending them down the line). She next worked for four years filling orders at a Dollar General warehouse, taking items off of shelves and putting them in totes. Tr. 60. She had a hard time

meeting completion requirements because she needed help reading the orders. She last worked in 2007 washing and folding uniforms. She and her husband moved after she had been in that position for about 6 months and she did not seek further employment. (Tr. 55, 60, 214). She took care of her husband before his death on July 4, 2008. (Tr. 55).

Plaintiff testified that she experienced pain in her back and knee. (Tr. 62). Her left knee "rubs bone to bone." (Tr. 56). She could stand for about one hour before she needed to sit down. She was unable to sit comfortably in one position for more than 20 minutes without shifting her position and she sometimes had to lie down to relieve knee and back pain. (Tr. 62, 69). She suffered from dry mouth and severely dry skin caused by Sjogren's syndrome.[4] Plaintiff testified that she often dropped things; for example, her coffee cup often fell out of her hand. (Tr. 68). As a result of her depression, she generally wanted to stay in her room, but antidepressant medication helped somewhat. She had never received counseling. Id. Stress made her multiple sclerosis "act up."

Plaintiff testified that she shared a two-story home with her brother and her deceased husband's brother, both of whom received disability. Her room was on the first floor. (Tr. 63-64). She swept her own room, but her brother-in-law took care of everything else, including laundry. He also did most of the shopping and cooking, although she drove to the grocery store about twice a week and cooked occasionally. (Tr. 64-66). Her son, who has bipolar disorder and is on disability, took care of yard work.

---

[4] Sjogren's syndrome is a disease of unknown cause marked by inflammation of the cornea and conjunctiva, dryness of the mouth, and connective tissue disease. See J.E. Schmidt Attorneys' Dict. of Medicine, Illustrated S-174 (28th ed. 1995).

The ALJ asked vocational expert Jeffrey F. Magrowski, Ph.D., to address plaintiff's vocational history and identify the exertional levels of her past work. (Tr. 72-3). Dr. Magrowski testified that plaintiff's past work as a uniform folder, warehouse worker, and radio packer were all performed at the light level and required the ability to use hands. (Tr. 73-74). The ALJ did not pose any hypotheticals to Dr. Magrowski.

## C. <u>Educational and Medical Records</u>

Educational records show that plaintiff consistently performed below grade level in grades 1 through 6. (Tr. 242-46). Plaintiff's scored in the 9th percentile on the Lorge Thorndike intelligence test when she was 7 years old. (Tr. 245). Her scores on the Stanford Achievement Test when she was 14 years old were below the 20th percentile in all subjects.[5] (Tr. 244). She left school at age 15 before completing seventh grade. (Tr. 246).

An x-ray of plaintiff's left knee taken on April 4, 2008, showed very slight narrowing at the medial knee joint. There was no evidence of bone destruction. (Tr. 643).

Plaintiff received annual checkups at the Ellis Fischel Cancer Center, following radiation treatment in 1998 for stage II anal cancer. On April 9, 2008, Steven J. Westgate, M.D., noted no change since his examination in March 20, 2007. (Tr. 259-60). Plaintiff reported that she had 3 or 4 episodes of mild rectal incontinence a

---

[5] Plaintiff's percentile scores were: paragraph meaning — 8; language — 2; arithmetic computation — 18; and science — 10. (Tr. 244).

month, for which he recommended she use Metamucil. On examination, Dr. Westgate noted "She looks great[,]" and rated her performance status at 0.[6]

On August 27, 2008, plaintiff consulted with rheumatologist Chokkalingam Siva, M.D., for complaints of joint pain. (Tr. 272-75). Plaintiff reported that she had pain in her shoulders, her left knee, and occasionally her hands, predominantly in her fingers, with episodic swelling. Plaintiff reported that she had had these symptoms for several years and was previously diagnosed with osteoarthritis. Plaintiff's medical history included hypercholesterolemia, insomnia, and thyroid disease. On examination, she had no synovitis or effusion of any joints. She had normal range of motion at all joints and neurologically symmetric muscles in her arms and legs. Dr. Siva determined that plaintiff had joint pain consistent with osteoarthritis of the knee joints. The "hand findings [a]re suggestive of osteoarthritis," predominantly in the distal joints of the fingers. Dr. Siva injected plaintiff's left knee and prescribed Tylenol and home exercises, in lieu of physical therapy, which plaintiff stated she could not afford.

Plaintiff received her primary medical care at the SSM Health Medical Group in Belle, Missouri. On September 2, 2008, plaintiff saw Jane Moore, R.N. (Tr. 392-93). Nurse Moore noted that plaintiff's past medical records showed an elevated

---

[6] "The ECOG Scale of Performance Status (PS) is widely used to quantify the functional status of cancer patients, and is an important factor determining prognosis in a number of malignant conditions. The PS describes the status of symptoms and functions with respect to ambulatory status and need for care. PS 0 means normal activity, PS 1 means some symptoms, but still near fully ambulatory, PS 2 means less than 50%, and PS 3 means more than 50% of daytime in bed, while PS 4 means completely bedridden." J.B. Sorensøn et al., Performance status assessment in cancer patients, 67 Br. J. of Cancer 773-75 (Apr. 1993). http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1968363/ (last visited September 3, 2015).

erythrocyte sedimentation rate or "sed rate,"[7] and mild anemia. Recent blood tests resulted in a positive ANA[8] and negative rheumatoid factor. Plaintiff reported that she received some benefit from the recent injection of her left knee. She also had some epigastric discomfort. Blood tests showed continued anemia. (Tr. 433). On September 9, 2008, Nurse Moore noted that a test for H. pylori was positive and prescribed antibiotics and Prilosec. (Tr. 390). On October 9, 2008, plaintiff reported that she still had some mild epigastric discomfort. (Tr. 387-88). She also complained of significant insomnia. She took Tylenol, ibuprofen, and Vicodin[9] for joint pain. She requested medication for insomnia. A physical examination was unremarkable. Blood tests on October 24, 2008, showed anemia, elevated triglycerides and cholesterol, and decreased glomerular filtration rate (GFR), a measure of kidney function. (Tr. 428-31).

On November 12, 2008, plaintiff told Dr. Siva that the knee injection was very helpful and she was doing home exercises. He prescribed tramadol,[10] Tylenol, and a topical preparation for pain. (Tr. 315).

A gastric biopsy completed on December 4, 2008, was negative for H. pylori. (Tr. 425). On December 15, 2008, primary care physician Richard Daugherty, M.D., noted that plaintiff had experienced some chest pain and gastric distress, probably

---

[7] The sed rate is a blood test that "indirectly measures how much inflammation is in the body." https://www.nlm.nih.gov/medlineplus/ency/article/003638.htm (last visited on Sept. 8, 2015).

[8] The ANA test detects antinuclear antibodies. In most cases, a positive ANA test indicates the presence of an autoimmune reaction. http://www.mayoclinic.org/tests-procedures/ana-test/basics/definition/prc-20014566 (last visited on Sept. 8, 2015).

[9] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[10] Tramadol is a narcotic prescribed for the treatment of moderate to moderately severe pain. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited Sept. 11, 2015).

related to reflux. He directed plaintiff to start taking Prilosec, follow a reflux diet, and stop smoking. (Tr. 384-85).

On February 2, 2009, plaintiff saw Nurse Shannon Wright, A.P.R.N., at the Belle SSM Health Medical Center. (Tr. 382). Plaintiff reported that she was experiencing increased anxiety, insomnia and stress, with occasional tearfulness. A physical examination was unremarkable. Nurse Wright noted that plaintiff took "intermittent hydrocodone and tramadol for issues related to arthritis." Blood tests showed continued anemia and decreased GFR. (Tr. 422, 424). Nurse Wright prescribed Celexa[11] and clonazepam to treat plaintiff's psychiatric symptoms. At follow-up on February 16, 2009, plaintiff reported some improvement in sleeping and anxiety and Nurse Wright increased the dosage of plaintiff's Celexa. Plaintiff was noted to be mildly anemic. (Tr. 380). On May 18, 2009, Nurse Wright noted that plaintiff's anemia appeared to be significantly improved with vitamin B12 replacement, but she continued to complain of anxiety and depression. Nurse Wright added trazadone[12] to the other medications plaintiff was prescribed. Her osteoarthritis pain was well controlled with intermittent tramadol and Vicodin. A physical examination was unremarkable. (Tr. 377-78).

On July 26, 2009, plaintiff saw Dr. Westgate for her annual checkup at the Ellis Fischel Cancer Center. (Tr. 442-43). She reported that she was still smoking "a little bit" and continued to have intermittent episodes of rectal incontinence. Dr. Westgate described plaintiff as "very nonconcerned about this." She was prescribed potassium and directed to take Metamucil. Her performance status remained at 0.

---

[11] Celexa, or citalopram, is in the SSRI class of antidepressants. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited on Sept. 18, 2015).

[12] Trazadone is a serotonin modulator and is prescribed to treat depression. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited Sept. 18, 2015).

(Tr. 438-40). A chest x-ray showed minimal atelectasis[13] but was otherwise unremarkable.

On August 19, 2009, plaintiff reported to Nurse Moore that her mood was significantly improved on Celexa, although she still had insomnia. Her joint pain was managed "fairly well" with occasional Vicodin and twice daily tramadol, with the exception of her left knee, which she felt had worsened. (Tr. 374-75). She reported that Metamucil was having a positive effect. On physical examination, it was noted that her tongue was extremely dry. With respect to her knees, plaintiff had mild bony enlargement of the knees with "somewhat fixed" patella, but no laxity, effusion or click. Her hands demonstrated some mild crepitus, edema and nodularity, but no increased joint enlargement. Plaintiff's left knee was injected and she was prescribed an increased dosage of amitriptyline to address insomnia. She continued to be anemic. (Tr. 418).

Plaintiff sought emergency treatment on September 3, 2009. (Tr. 501-18). She reported that she had been sitting at her computer and began to feel light headed with tingling in her right arm. (Tr. 507). An EKG, chest x-ray, CT scan of the head, and blood work were all unremarkable. (Tr. 371). She was diagnosed with hypertension, new onset. (Tr. 506). At follow-up on September 8, 2009, Nurse Moore noted that plaintiff had been monitoring her blood pressure at home and that her home readings showed significant improvements. A physical examination was unremarkable and plaintiff reported that her left knee pain improved following her most recent injection. Nurse Moore ordered an MRI of plaintiff's brain. (Tr. 371-72).

---

[13] Atelectasis is the collapse of part or, less commonly, all of a lung. https://www.nlm.nih.gov/medlineplus/ency/article/000065.htm (last visited on Sept. 8, 2015).

The MRI completed on September 16, 2009, disclosed multiple foci of abnormal white matter signal, consistent with chronic ischemic change or a demyelinating process. (Tr. 305-06). Plaintiff was referred to the Neurology Clinic at the University of Missouri—Columbia, where she was seen on October 13, 2009. (Tr. 292-95). She reported episodes of dizziness, needle-like sensations in her limbs and abdomen, and dull headaches. On examination, she had normal muscle bulk, tone, and strength. Her reflexes and gait were normal but she had impaired response to touch on the right side of her body. Plaintiff presently had no functional impairment. Plaintiff was referred for a rheumatology consultation and further diagnostic tests. A Magnetic Resonance Angiogram (MRA) of the head and neck were negative. (Tr. 290-91).

On November 18, 2009, plaintiff returned to see Dr. Siva at the Rheumatology Clinic. (Tr. 311-14). She reported that she had a positive blood test for lupus. She also complained of dry mouth. On examination, plaintiff had no swollen or tender joints and no synovitis. She had full ranges of motion at all joints and normal muscle strength. She continued to have a nodule on one finger. Dr. Siva opined that the clinical findings suggested multiple sclerosis, rather than lupus, and prescribed hydroxychloroquine.[14] He also warned plaintiff that the medication was likely to be less effective if she continued to smoke. He suggested that she

---

[14]Hydroxychloroquine, or Plaquenil, is an antimalarial that is used to treat lupus and rheumatoid arthritis. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html (last visited on Sept. 8, 2015). It has also been prescribed to treat the symptoms of Sjogren's Syndrome. See J-E Gottenberg, et al., Effects of Hydroxychloroquine on Symptomatic Improvement in Primary Sjögren Syndrome, 312(No. 3) JAMA 249 (July 16, 2014). http://jama.jamanetwork.com/article.aspx?articleid=1887760 (last visited on Sept. 18, 2015).

speak with her primary care physician about decreasing her psychotropic medications in order to alleviate her dry mouth.

Plaintiff received treatment for upper respiratory symptoms on December 18, 2009, and January 18, 2010. (Tr. 366, 363-64). Her osteoarthritis was fairly well controlled at this time. She continued to be anemic. (Tr. 409).

Plaintiff returned to the Neurology Clinic on February 2, 2010. (Tr. 283-86). She reported that she had not had any further episodes of dizziness but occasionally experienced tingling and pins-and-needles sensations. She continued to display full strength and a normal gait. At this evaluation, she displayed no sensory loss. Based on her clinical history, the prior objective evidence of sensory loss, and the results of imaging studies and blood tests, she was diagnosed with multiple sclerosis. It was recommended that she start treatment with Betaseron. The following week, plaintiff's rheumatologist, Dr. Siva, continued plaintiff's prescription for Plaquenil and again recommended that plaintiff stop smoking. (Tr. 306-08).

In May 2010, Nurse Moore noted that plaintiff had had to suspend treatment with Betaseron while she was treated for a MRSA infection. (Tr. 355-59). Blood tests showed continued anemia and elevated liver function tests and creatinine[15] levels. (Tr. 398, 404-05). A Neurology Clinic note dated May 11, 2010, states that plaintiff's tingling sensations had decreased since she started using Betaseron. (Tr. 280-81). Plaintiff similarly reported to Dr. Siva that her arthralgias, fatigue, and Sjogren's symptoms had significantly improved. (Tr. 302-04).

---

[15] Elevated creatinine levels signify impaired kidney function or kidney disease. http://www.medicinenet.com/creatinine_blood_test/article.htm (last visited Sept. 11, 2015).

On July 26, 2010, oncologist Dr. Westgate noted that plaintiff had radiating achiness in her hips, consistent with nonspecific radiation fibrosis or bursitis. (Tr. 446-47). Dr. Westgate again told plaintiff that Trental and Vitamin E might relieve the achiness and incontinence, but that she needed to quit smoking before she could try this treatment. She stated that she planned to stop smoking soon. Plaintiff's performance status was downgraded to 1. (Tr. 487).

On August 17, 2010, Nurse Wright noted that plaintiff had irritation at the Betaseron injection site. (Tr. 596-97). Plaintiff reported that her arthritis and dyspepsia were controlled by medication and that she had stopped taking Celexa and Elavil because her mood was "quite good." Her anxiety was managed with clonazepam and she slept through the night. Blood work completed that day showed continued anemia. (Tr. 495-98).

In September 2010, plaintiff went to the emergency room with a severe headache. (Tr. 519-25). Imaging studies were negative and she was released with prescriptions for Vicodin and Compazine.[16] At follow-up, Nurse Wright opined that the headache resulted from plaintiff's decision to resume taking Celexa at the full dosage, rather than the half dosage that had been prescribed. (Tr. 593). Plaintiff also reported chest pressure after eating. An examination was unremarkable with the exception of elevated blood pressure. Nurse Wright prescribed Celexa, Elavil, and Prilosec. In October 2010, plaintiff reported that her anxiety, depression and insomnia were all improved and her chest pain and GERD had resolved. (Tr. 591).

---

[16] Prochlorperazine, also known as Compazine, is used to control severe nausea and vomiting and to treat the symptoms of schizophrenia and anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited on Sept. 18, 2015).

Plaintiff saw Dr. Siva on November 16, 2010. (Tr. 535-37). Her numbness, tingling, and Sjogren's symptoms had improved with medication. Dr. Siva noted that plaintiff was not able to reduce the dosage of her psychotropic medications. On examination, plaintiff had full ranges of motion and muscle strength and she had no synovitis or swollen or tender joints. At follow-up with the Neurology Clinic that same day, plaintiff reported that her symptoms had improved. (Tr. 671-73). A sensory examination was unremarkable.

On November 17, 2010, Nurse Wright noted that plaintiff was having difficulty with GERD. Nurse Wright recommended treatment with proton pump inhibitors, but plaintiff was unable to afford the medication. (Tr. 589). Blood tests showed some improvement in plaintiff's anemia. See Tr. 596. On December 21, 2010, plaintiff reported slight improvement in her dysphagia. Nurse Wright provided plaintiff samples of Dexilant[17] to be taken with Zantac, and advised her to quit smoking. (Tr. 586-87). On January 5, 2011, plaintiff reported overall improvement in her dysphagia and GERD. (Tr. 584). However, she reported episodes of chest tightness and palpitations. Cardiac tests completed in January 2011 were normal. (Tr. 630-31).

Plaintiff underwent an MRI of the brain on January 7, 2011. The number and distribution of foci were grossly unchanged but there were indications of possible active inflammation. (Tr. 521-22). An MRI of the cervical spine taken the same day disclosed moderate cervical spondylosis at C5-C6 with severe left-sided stenosis. A right-sided disc osteophyte complex at the same level caused moderate right-sided

---

[17] Dexilant, or dexlansoprazole, is a proton pump inhibitor. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a609017.html (last visited Sept. 14, 2015).

stenosis. There was mild degenerative disc disease at other levels without significant stenosis. (Tr. 523-25).

On March 15, 2011, Nurse Wright noted that plaintiff had undergone an upper endoscopy, during which a mild stricture was dilated. Plaintiff's GERD was controlled with Dexilant. (Tr. 579).

On May 23, 2011, Nurse Wright noted that plaintiff had chronic hip and leg pain. (Tr. 711-12). She had no radicular symptoms or motor weakness. Her anxiety and depression was generally well treated and Dexilant provided relief for her ongoing reflux symptoms. On examination, plaintiff had no edema but had crepitus of the knees. Phalen's Test was positive for the right hand, with decreased sensation. Plaintiff declined to undergo nerve conduction studies for carpal tunnel syndrome. Nurse Wright described plaintiff's gait as antalgic with prolonged sitting and noted that she appeared dizzy and had a "bit of shuffle gait." Nurse Wright opined that plaintiff's osteoarthritis inhibited her ability to work.

Nurse Wright also completed a medical source statement on May 23, 2011. (Tr. 645-47). She opined that plaintiff could seldom lift or carry any weight less than 20 pounds and could never lift or carry any weight above 20 pounds. She was capable of sitting for 1 hour and standing or walking for 3 hours in an 8-hour work day and needed to alternate between sitting and standing every 30 minutes. She could only seldom use her feet for operating leg controls. She rarely needed to use a hand-held assistive device. She could occasionally use her hands to grasp, push or pull, reach, or handle (though it was noted that she dropped things) and could never use her hands for fingering. In terms of postural limitations, plaintiff could occasionally reach overhead or extend her arms out, but could only seldom bend,

climb, balance, stoop, kneel, crouch, or squat. Plaintiff experienced constant fatigue, frequent pain, and occasional shortness of breath and vertigo, due to stiffness and multiple sclerosis flares which caused numbness and near syncope. As objective support for these limitations, Nurse Wright cited plaintiff's gait disturbance, slow ambulation, and shuffling; degenerative changes in her fingers and the positive Phalen's test in the right hand; and crepitus in both knees. Blood tests showed mild anemia with B12 deficiency. See Tr. 705.

At an office visit on June 24, 2011, plaintiff complained of pain in her right knee and asked for an injection. (Tr. 705-06). She reported no recent flare of her multiple sclerosis. Her GERD and depression were both well-controlled with medication. On examination, she had crepitus of the knee with abnormal patellar tracking, but no synovitis, erythema, or warmth. An x-ray of the right knee showed mild joint space narrowing, but no joint effusion or acute bony abnormality. (Tr. 708).

Divyajot S. Sandhu, M.D., began following plaintiff through the Neurology Clinic on July 13, 2011. Plaintiff reported that her multiple sclerosis had been stable over the last month; her one consistent problem was that she occasionally ran into things. (Tr. 662-65). During a review of systems, Dr. Sandhu noted that plaintiff had fatigue, falls, clumsiness, and arthritis. On mental status examination, plaintiff was alert and oriented, was able to repeat and recall 3 objects, and her abilities to perform calculations and follow multi-step commands were intact. She had normal muscle bulk, tone and strength, with slightly decreased sensation on the left side. Her gait was normal.

Christine Cruzen[18] completed a Physical Residual Functioning Capacity Assessment (PRFCA) on July 20, 2011. (Tr. 79-85). Ms. Cruzen found that plaintiff could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently; sit and stand or walk about 6 hours in an 8-hour day; and had unlimited capacity to push or pull with her hands or feet.

On July 22, 2011, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique. (Tr. 649-59). Dr. DeVore concluded that plaintiff met the criteria for affective disorders (depression), but that her impairment was not severe. He further found that she had no restrictions in the activities of daily living or maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. Dr. DeVore noted that plaintiff's functional limitations were due to pain and that she reported being able to clean the house, ride a lawn mower, shop, leave the house, work on a computer, watch television, work on puzzle books, and visit her son. Her medically determinable impairments of depression and anxiety were treated with medication. The medical record repeatedly reflected that she presented with appropriate mood and affect.

Plaintiff was seen at the Ellis Fischel Cancer Center on September 6, 2011. (Tr. 678-79). She reported that she continued to do fairly well despite her chronic illnesses and her energy level was described as adequate. Her potassium levels were low. Dr. Westgate noted that plaintiff had finally quit smoking. (Tr. 685-86).

---

[18] Ms. Cruzen is identified in the form as a Single Decisionmaker (SDM). Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report, Single Decisionmaker Model — Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (A-01-12-11218) (Aug. 2013) (available at http://oig.ssa.gov/audits-and-investigations/audit-reports/A-01-12-11218).

She reported that she had tried Trental and Vitamin E to see if that helped her symptoms of bursitis, arthritis, and perianal fibrosis and tenderness. She stopped the treatment after 6 months because she had no improvement. Due to the medications she was taking, she no longer had diarrhea or incontinence and was struggling with constipation. Overall, she was stable with no evidence of metastatic disease.

On September 19, 2011, Nurse Wright noted that plaintiff quit smoking in August 2011. (Tr. 695-96). She ran out of samples of Dexilant and reported uncontrolled GERD. She also complained of poor sleep and fatigue. On examination, she was alert, appropriate, and pleasant. She had no edema, synovitis, erythema or warmth. She returned on October 21, 2011, for evaluation of a finger which she injured in a fall. An x-ray of her left hand showed degenerative changes. (Tr. 691-92). Plaintiff stated that she had not had many multiple sclerosis symptoms, and had no recent fevers, chest pain, shortness of breath, abdominal pain or other concerning symptoms. She had recently obtained insurance and was able to take Prilosec for her GERD. She was given a splint for her finger and a prescription for hydrocodone for chronic pain and osteoarthritis.

On December 13, 2011, Dr. Siva noted that plaintiff's affect and mood were appropriate; her joints were not swollen or tender and showed no synovitis; and she had normal ranges of motion and muscle strength. Dr. Siva noted that she had early chronic kidney disease and advised her to monitor her blood pressure. (Tr. 756-58). On December 16, 2011, Nurse Wright noted that plaintiff continued to experience dyspepsia. (Tr. 856-57). Plaintiff had intermittent numbness in her left foot and fatigue, but had not had any headaches, falls, chest pain, or shortness of

breath. She reported uncontrolled insomnia and some anxiety. Blood tests showed that plaintiff's creatinine, thyroid stimulating hormone, and liver function tests were elevated. (Tr. 870). Nurse Wright increased plaintiff's dosage of Prilosec, discontinued clonazepam, and prescribed Ambien for sleep. A CT scan of plaintiff's abdomen and pelvis disclosed no hepatic masses but did show advanced atherosclerotic calcifications of the aorta and major abdominal branch vessels. (Tr. 874). On January 16, 2012, plaintiff sought treatment for an upper respiratory infection. (Tr. 854). She reported that she had cut back on smoking.

On March 1, 2012, plaintiff told Nurse Wright that she had had pain in her right shoulder for four to five days. (Tr. 851-52). She did not have any weakness in her grip or altered range of motion and an x-ray showed some mild osteoarthritic changes. She also reported an episode of chest pain due to uncontrolled GERD, and some lightheadedness which she attributed to her multiple sclerosis. Finally, plaintiff had chronic back pain. Nurse Wright prescribed Nexium for GERD and tramadol for back pain.

Plaintiff was seen at the Neurology Clinic on March 28, 2012. (Tr. 794-98). Dr. Sandhu noted that plaintiff occasionally experienced a burning pain in her right calf. In addition, her right leg turned outward and sometimes buckled when she walked. Possible differential diagnoses included mononeuritis, a new spinal multiple sclerosis lesion, and lumbosacral plexopathy. An EMG and nerve conduction study completed on June 13, 2012 were normal. (Tr. 996).

On May 4, 2012, Nurse Wright noted that plaintiff's dyspepsia was uncontrolled. She resumed Dexilant. (Tr. 849).

On June 6, 2012, Dr. Siva noted that plaintiff still complained of low back pain and arthralgias but no significant joint swelling. He recommended that she obtain a prescription for Vicodin from her primary care physician. On examination, she had normal ranges of motion for all joints without synovitis or swelling or tenderness. She had normal muscle strength. He noted that she continued to take nonsteroidal anti-inflammatory medications against his advice. She continued to smoke.

On June 8, 2012, plaintiff saw Nurse Wright with complaints of earache and elevated blood pressure. (Tr. 847-48). She also complained of fatigue, reflux and nausea, muscle and joint pain, and depression. On June 10, 2012, plaintiff was transported to the emergency room by ambulance for complaints of acute abdominal pain and intermittent chest pain. (Tr. 762-80). At admission, it was noted that plaintiff had an unsteady gait and back pain with range of motion. (Tr. 763). Chest x-rays showed no acute cardiopulmonary disease. (Tr. 768). A CT scan of the abdomen and pelvis showed diffuse fatty infiltration of the liver and degenerative changes at multiple levels of the spine. (Tr. 769).

Plaintiff returned to the Neurology Clinic on July 11, 2012. (Tr. 783-86). She reported that she had been doing well since her last visit. A recent MRI of her brain showed no changes when compared to the last MRI. Her neurological examination was normal; she was oriented and her comprehension and memory were intact. A motor examination was also normal, with no abnormal movements noted and full muscle strength and normal tone and bulk. Dr. Sandhu increased her gabapentin[19]

---

[19] Gabapentin is an anti-epileptic and can be used in multiple sclerosis to control dysesthesias (pain caused by MS lesions) and the pain caused by spasticity. http://www. nationalmssociety.org/Treating-MS/Medications/Neurontin# (last visited on Sept. 18, 2015).

dose from 100 to 200 mg,[20] and she was referred to physical therapy for gait training. (Tr. 786, 794).

On September 7, 2012, plaintiff presented with a lump in her right groin and pain in her sacroiliac joint. She also complained of needle-like pain in her chest area, consistent with multiple sclerosis flares. (Tr. 821-24). She had fatigue, fever, chills, and weakness. On examination, no movement disorder was noted. At follow up on September 18, 2012, plaintiff complained of swelling, pain, and stiffness in her right knee, and low back pain that radiated to her right hip and knee. (Tr. 812-16). Plaintiff rated her pain at 8 on a 10-point scale. She had trouble straightening her knee after prolonged sitting. She continued to have tenderness in the right groin area. On examination, Nurse Wright noted fatigue, chronic muscle weakness, and crepitus in the right knee.  A straight leg test was positive on the right side. X-rays showed mild degenerative changes in the right knee and severe lumbar spondylosis and osteoporosis. (Tr. 815). An MRI of the lumbar spine confirmed that plaintiff had degenerative disc disease at multiple levels and disc herniation or bulges at L1-L2, L2-L3, L3-L4, and L4-L5. She had moderate to moderately severe nerve impingement on the left side. (Tr. 877-78). The findings at L3-L4 and L4-L5 were more pronounced when compared to a CT scan from January 2012.

On October 10, 2012, Nurse Wright met with plaintiff to review the MRI findings. (Tr. 801-11). Plaintiff complained of back pain, which she rated at level 8. Her groin pain was resolved. Her liver function tests were elevated. Nurse Wright recommended that plaintiff see a spine specialist.

### III.  The ALJ's Decision

---

[20] It is unclear from the record when plaintiff began taking gabapentin.

In the decisions issued on April 12, 2013, the ALJ made the following findings with respect to plaintiff's applications for a period of disability and disability insurance benefits:

1.  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012.

2.  Plaintiff did not engage in substantial gainful activity from her alleged onset date of October 21, 2007, through her date last insured.

3.  Through the date last insured, plaintiff had the following severe impairments: combination of osteoarthritis, Sjogren's Syndrome, and degenerative disc disease of the cervical and lumbar spine.

4.  Through the date last insured, plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b).

6.  Through the date last insured, plaintiff was able to perform her past relevant work as a folder, a warehouse worker and hand packer. This work did not require work-related activities precluded by plaintiff's residual functional capacity.

7.  Plaintiff was not under a disability within the meaning of the Social Security Act from October 21, 2007, through December 31, 2012.

(Tr. 32-42).

The ALJ's findings with respect to plaintiff's disabled widow's benefits were substantially the same, except that the eligibility period for these benefits extended to July 31, 2015. (Tr. 15).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108

F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her

limitations."Moore,572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the

claimant's complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ incorrectly determined her residual functional capacity (RFC).

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's

RFC." Id. (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

The ALJ determined that plaintiff retained the RFC to perform the full range of light work. The regulations define light work as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday." Social Security Regulation (SSR) 83–10, 1983 WL 31251, at *6 (Dec. 12, 1983). Plaintiff argues that, in determining that she had the capacity to perform light work, the ALJ improperly assessed her multiple sclerosis, osteoarthritis, history of anal cancer, depression and anxiety, and learning disabilities.

**Multiple Sclerosis**: The ALJ found that plaintiff's multiple sclerosis was well-controlled and therefore was not a serious impairment. (Tr. 16, 35). An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. See Bowen v. Yuckert, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a). Severity is not an

onerous requirement for the claimant to meet, but it is also not a toothless standard. <u>Kirby v. Astrue</u>, 500 F.3d 705, 708 (8th Cir. 2007) (citation omitted). If an ALJ incorrectly fails to find an impairment to be severe, the error is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process. <u>Faint v. Colvin</u>, 26 F. Supp. 3d 896, 910 (E.D. Mo. 2014).

The court finds that the ALJ erred in concluding that plaintiff's multiple sclerosis was not a serious impairment. The court further finds that the error is not harmless because the ALJ did not consider the effects of the multiple sclerosis in determining plaintiff's RFC. Plaintiff consistently displayed symptoms of multiple sclerosis, including fatigue, light-headedness, and needle-like sensation. In July 2011, plaintiff reported that she ran into things and complained of falls and clumsiness. In December 2011, she reported intermittent numbness in her left foot. (Tr. 856). In March 2012, it was noted that her right leg turned outward and sometimes buckled when she walked. She had paresthesias of the right calf and absent reflexes. (Tr. 794-98). In June 2012, emergency room personnel noted that plaintiff had an unsteady gait. (Tr. 763). These conditions would affect plaintiff's ability to walk and stand and the ALJ was required to consider limitations arising from multiple sclerosis before determining plaintiff's RFC.

The only medical opinion evidence in the record was proffered by Nurse Wright, who opined that plaintiff's limitations prevented her from working. The ALJ rejected Nurse Wright's opinion, in part, because she was not an acceptable

medical source as defined by the regulations.[21] (Tr. 21, 40). Once the ALJ rejected Nurse Wright's opinion, she had a duty to further develop the record to obtain medical evidence regarding plaintiff's limitations. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (ALJ has independent duty to develop the medical record); Jackson v. Colvin, No. 4:13-CV-233-NAB, 2013 WL 6571600, at *2 (E.D. Mo. Dec. 13, 2013) (ALJ had duty to develop record where plaintiff was treated for multiple sclerosis and alleged symptoms consistent with diagnosis). The ALJ should have obtained a medical source statement from Dr. Sandhu or ordered a consultative evaluation to determine the effect of plaintiff's multiple sclerosis on her ability to work.

**Osteoarthritis and other pain**: Plaintiff argues that the ALJ improperly evaluated the effects of her osteoarthritis and degenerative disc disease. Specifically, plaintiff alleges that the ALJ made factual errors in determining that plaintiff's allegations of disabling pain in her knees, hands, and back were not credible. (Tr. 18, 40).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include: "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any

---

[21] The ALJ also found that Nurse Wright's opinion was inconsistent with the record as a whole. (Tr. 21, 40).

medication; and (5) the claimant's functional restrictions." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004) (<u>citing</u> <u>Polaski</u>, 739 F.2d at 1322). "When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the <u>Polaski</u> factors." <u>Renstrom v. Astrue</u>, 680 F.3d 1057, 1066 (8th Cir. 2012) (citation omitted). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." <u>Id.</u> (alteration in original; citation omitted). When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ cited discounted plaintiff's knee pain, stating that she "navigate[d] the stairs" of her "three-story home" on a "daily" basis. (Tr. 20, 39). This is a misstatement of the evidence in the record: plaintiff testified that she lives in a two-story home with a basement and that her room is on the main floor. The laundry facilities were in the basement, but she did not do her own laundry. (Tr. 63-64). Thus, there is no evidence that plaintiff navigated stairs on a daily basis. The ALJ also stated that plaintiff did not take narcotic medications. However, the record establishes that throughout the period covered by the medical records plaintiff was routinely prescribed Vicodin and Tramadol, which she used in conjunction with ibuprofen and Tylenol. (Tr. 389, 315, 382, 377, 438, 374, 366, 364, 662, 692, 851, 823, 812, 801). In addition, plaintiff was administered injections to treat knee pain. (Tr. 273, 375; <u>see also</u> 705 (requesting injection)). The ALJ also cited the lack of physical therapy as a reason for discrediting plaintiff's

claims. In 2008, Dr. Siva recommended physical therapy to treat plaintiff's left-knee pain, but she could not afford it. And, in July 2012, Dr. Sandhu ordered physical therapy to treat plaintiff's gait imbalance. (Tr. 274). The ALJ also incorrectly stated that plaintiff did not use a cane. (See Tr. 231, 226, 646). The ALJ's credibility determination is flawed as a result of these factual errors.

Plaintiff also complains that the ALJ did not properly account for the clinical findings in MRIs and CT scans of her spine. In January 2011, an MRI disclosed moderate cervical spondylosis, severe left-sided stenosis, moderate right-sided stenosis, and mild degenerative disc disease at other levels of the spine. (Tr. 523-24). A CT scan completed in June 2012 showed "degenerative changes at multiple levels of the spine." (Tr. 769). In September 2012, Nurse Wright recorded that an x-ray showed severe lumbar spondylosis and osteoporosis. (Tr. 815). Finally, an MRI of the lumbar spine in October 2012 showed degenerative disc disease at multiple levels and disc herniation or bulges throughout the lumbar spine. Two of the bulges were more pronounced than they had been 10 months earlier and showed moderate to moderately severe nerve impingement on the left side. On remand, the ALJ should obtain a medical opinion regarding the significance of these objective findings.

**Nonexertional impairments**: Plaintiff argues that the ALJ failed to properly consider her learning disabilities and depression and anxiety. The ALJ found that there was no evidence in the record that plaintiff had been diagnosed with learning disabilities. Her education records show very low academic performance and plaintiff reports that she cannot read or write well, a condition that negatively affected her ability to perform her work as an order filler. With respect to

depression and anxiety, the record reflects that, despite medication, plaintiff consistently reported that she suffered from insomnia and fatigue. The ALJ should develop the record to determine whether to include nonexertional limitations in the RFC determination.

**Other conditions**: The record establishes that plaintiff had chronic poorly-controlled anemia and GERD. On remand, the ALJ should address whether these conditions have an effect on plaintiff's RFC. As a result of her treatment for anal carcinoma, plaintiff appears to suffer from diarrhea and incontinence. Plaintiff routinely reported to Dr. Westgate that she was not concerned by these conditions and the ALJ did not err in failing to include limitations in the RFC determination. Dr. Westgate noted that plaintiff had pain in her hips which could be attributed to radiation fibrosis. The ALJ should address whether this pain imposes restrictions on plaintiff's capacity to perform work-related activities.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings. A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 4th day of March, 2016.